United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALFONZO WILLIAMS, et al.

Defendants.

Case No.  3:13-cr-00764-WHO-1

**ORDER ON POST-TRIAL MOTIONS**

Re: Dkt. Nos. 1760, 1780, 1781, 1782, 1784, 1787

## INTRODUCTION

On June 1, 2018, I heard argument on motions for acquittal and new trial filed by the five defendants convicted of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d).  Three of the defendants were also convicted of additional substantive counts. .  The motions are DENIED for the reasons discussed below.

## BACKGROUND

On August 14, 2014, the government filed the Second Superseding Indictment ("SSI"), which charged twenty-two counts against various defendants.  Count One charges ten of eleven defendants with conspiracy to conduct the affairs of the enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962(d),[1] and includes a special sentencing factor of conspiracy to commit murder.  SSI ¶¶ 1–17; *id*. ¶ 64.  Counts two, three, and four, brought against defendants Alfonzo Williams, Antonio Gilton, Barry Gilton, and Lupe Mercado, pertain to the June 2012 murder of Calvin Sneed.  SSI ¶¶ 18–25.  Count five charges Lupe Mercado with accessory after the fact related to the offenses charges in counts two, three, and four.  SSI ¶¶ 26–

---

[1] Lupe Mercado is not charged with count one.

27. Counts six, seven, and eight, brought against defendants Reginald Elmore and Charles Heard, pertain to the August 2008 double murder of Andre Helton and Isaiah Turner. SSI ¶¶ 28–33. Counts nine, ten, and eleven, brought against defendant Adrian Gordon, pertain to the May 2011 attempted murder of Patrick McCree (identified in the indictment as "Victim 3"). SSI ¶¶ 34–39. Counts twelve, thirteen, fourteen, and fifteen, brought against defendant Esau Ferdinand, stem from the April 2011 assault with a deadly weapon of Vanson Truong (identified in the indictment as "Victim 2"). SSI ¶¶ 40–47. Counts sixteen and seventeen charge defendant Paul Robeson with attempting to entice and persuade a minor to engage in prostitution. SSI ¶¶ 48–51. In counts twenty and twenty-one, defendant Jaquain Young is charged with violating the same statutes. SSI ¶¶ 60–63. Counts eighteen, nineteen, and twenty, brought against defendant Jaquain Young, pertain to the November 2010 murder of Jelvon Helton. SSI ¶¶ 52–57.

In count one, the government alleges that a violent street gang known as Central Divisadero Players, also known as "Central Divisadero Playas," also known as "Central Divis Playas," also known as the "CDP" gang, constitutes a racketeering enterprise whose members "have engaged in criminal activity, including murder, attempted murder, narcotics distribution, assault, robbery, extortion, interstate transportation in aid of racketeering, pimping, pimping of minors, illegal firearms possession, and obstruction of justice by threatening and intimidating witnesses whom they believed to be cooperating with law enforcement and by destroying evidence and providing false information to law enforcement." SSI ¶¶ 1, 4. It contends that, "since at least the mid-1990s, and continuing up through and including the present," the defendants conspired "to conduct and participate, directly and indirectly, in the conduct of the affairs of the CDP enterprise though a pattern of racketeering activity... ." SSI ¶ 15.

The SSI alleges the following overt acts in furtherance of the conspiracy: (a) April 6, 1997, Alfonzo Williams possessed approximately 13 ounces of cocaine base; (b) August 3, 2002, Jaquain Young persuaded an individual under 16 to engage in prostitution; (c) January 13, 2003, Charles Heard possessed 4.83 grams cocaine base; (d) April 3, 2003, Charles Heard possessed 9mm firearm in vehicle; (e) March 18, 2004, Paul Robeson possessed 40 packaged rocks (approximately 4.73 grams) cocaine base; (f) March 18, 2004, Charles Heard possessed a firearm;

(g) May 23, 2005, Esau Ferdinand possessed 5.17 grams cocaine base; (h) August 6, 2005, Paul Robeson harassed and attempted to recruit an individual to work for his as his prostitute; (i) November 16, 2005, Paul Robeson enticed a minor to engage in prostitution; (j) in or around 2005, Jaquain Young threatened a witness in retaliation for reporting a crime; (k) February 4, 2007, Charles Heard possessed a firearm and ammunition; (l) March 10, 2007, Paul Robeson attempted to kidnap a woman by trying to force her into a vehicle; (m) April 6, 2007, Antonio Gilton carried a loaded, concealed firearm in his vehicle; (n) April 24, 2007, Reginald Elmore possessed a 9 mm Beretta firearm; (o) May 1, 2008, Antonio Gilton possessed approximately 9.84 grams of cocaine base; (p) May 13, 2008, Esau Ferdinand, accompanied by Reginald Elmore, and others, was found in possession of a .40 caliber Taurus pistol and ammunition; (q) June 30, 2008, Alfonzo Williams and a KOP gang member used coded language to discuss a sale of a quarter kilogram of cocaine from Williams to the KOP gang member; (r) July 4, 2008, Adrian Gordon possessed a .45 caliber Llama firearm; (s) July 16, 2008, Heard gave advice to KOP member about how to rob jewelry and pawn it, as well as the price of cocaine; (t) August 14, 2008, Reginald Elmore and Charles Heard killed Isaiah Turner and Andre Helton; (u) November 25, 2008, Charles Heard killed Richard Barrett; (v) January 8, 2009, Reginald Elmore brandished and discharged a 9 mm assault style pistol during the funeral of a rival gang member; (w) October 6, 2009, Monzell Harding, Jr., Esau Ferdinand, and others attempted to intimidate a testifying witness; (x) On January 15, 2010, Monzell Harding, Jr. robbed an iPod; (y) November 1, 2010, Jaquain Young killed Jelvon Helton; (z) April 3, 2011 Esau Ferdinand robbed and shot victim 2 (identified as Vanson Truong); (aa) May 20, 2011, Adrian Gordon attempted to kill victim 3 (identified as Patrick McCree); (bb) November 5, 2011, Adrian Gordon robbed victim 4; (cc) June 4, 2012, Alfonzo Williams, Antonio Gilton, Barry Gilton, and Lupe Mercado killed Calvin Sneed; (dd) August 9, 2012, Jaquain Young attempted to persuade an individual to travel for prostitution; (ee) from August 9, 2012 through March 11, 2013, Jaquain Young attempted to persuade an individual to travel for prostitution; (ff) from October 1, 2012 through October 10, 2012, Paul Robeson attempted to persuade, induce, entice, and coerce an individual to engage in prostitution; (gg) from October 1, 2012 through October 10, 2012, Paul Robeson attempted to persuade, induce, entice, and coerce a minor to

engage in prostitution; (hh) on November 24, 2012, Reginald Elmore and an admitted CDP member were found and arrested together in a car in possession of a 9 mm firearm and 11 rounds of ammunition; (ii) December 17, 2013, Adrian Gordon, several other members of CDP, and others, were together in a residence where four firearms were found. SSI ¶ 17.

Jury selection began for defendants Esau Ferdinand, Adrian Gordon, Monzell Harding, Jr., Charles Heard, and Jaquain Young on October 23, 2017, and trial commenced on November 6, 2017. 11/6/17 Criminal Minutes (Dkt. No. 1463). On February 5, 2018, after the government rested its case, the defendants moved for judgments of acquittal. 2/5/18 Criminal Minutes (Dkt. No. 1683). I reserved decision on the motions and the defendants proceeded to present their cases to the jury. *See id.* Following jury instructions and closing arguments, the case was submitted to the jury on February 26, 2018.[2] Criminal Minutes (Dkt. No. 1766). On March 5, 2018, the jury returned the following verdict: as to Esau Ferdinand, guilty on count 1, not guilty on counts 12, 13, 14, and 15; as to Adrian Gordon, guilty on counts 1, 9, 10, and 11; as to Monzell Harding, Jr., guilty on count 1; as to Charles Heard, guilty on counts 1, 6, 7, and 8; and as to Jaquain Young, guilty on counts 1, 18, 19, 20, 21, and 22. Jury Verdict (Dkt. No. 1765).

On March 16, 2018, the parties stipulated to a briefing schedule for these post-trial motions, which I adopted on March 26, 2018. Stipulation (Dkt. No. 1770); Order (Dkt. No. 1775).

## LEGAL STANDARD

## I.     MOTION FOR A JUDGMENT OF ACQUITTAL

Under Federal Rule of Criminal Procedure 29, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015).

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

---

[2] The jury began deliberations on February 27, 2018. Criminal Minutes (Dkt. No. 1767).

> ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Jackson*, 443 U.S. at 319.  The trial court should apply the following test:

> First, the evidence must be viewed in the light most favorable to the government; and second, the reviewing court must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.

*United States v. Ramos*, 558 F.2d 545, 546 (9th Cir. 1977).

## II.     MOTION FOR A NEW TRIAL

Under Federal Rule of Criminal Procedure 33, "[u]pon a defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.  "A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992).  "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  *Id*. (quoting another source).  "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."  *Id*. at 1211–12 (quoting another source).  The decision is within the sound discretion of the district court.  *Id*.

## DISCUSSION

## I.      COUNT 1: RICO CONSPIRACY

### A.     Background

Each of the defendants was convicted of RICO conspiracy under 18 U.S.C. § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section."  "[A] defendant is guilty of conspiracy to violate § 1962(c) if the evidence showed that [he] 'knowingly agree[d] to facilitate a scheme which includes

the operation or management of a RICO enterprise.'" *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005). Under this test, a defendant need not play a role in the operation or management of the RICO enterprise himself. *See id.* (recognizing that prior circuit authority to the contrary was effectively overruled by *Salinas v. United States*, 522 U.S. 52, 62 (1997)).

Gordon argues that there was insufficient evidence of the enterprise and insufficient evidence of his association with the charged enterprise. Gordon's Mot. to Set Aside Verdict and for New Trial (Dkt. No. 1780). Harding likewise argues that there was insufficient evidence linking him to the charged enterprise, that evidence of uncharged acts was improperly admitted to prove the existence of the enterprise, and that the evidence proved multiple conspiracies as opposed to a single, overarching conspiracy, which constitutes a variance from the charged conduct. Harding's Mot. for J. of Acquittal (Dkt. No. 1760); Harding's Mot. for New Trial (Dkt. No. 1782).[3] Young also contends that there was insufficient evidence to sustain his conviction on count one. Young's Mot. for J. of Acquittal; Mot. for New Trial and Joinder (Dkt. No. 1784). Defendants Heard and Ferdinand join the other defendants in the challenges applicable to each. Heard's Partial Joinder (Dkt. No. 1786); Ferdinand's Joinder (Dkt. No. 1787).

**B.    Sufficiency of the RICO Enterprise Evidence and Defendants' Association With It**

### 1.    Definition

RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Christensen*, 828 F.3d at 780. "This expansive definition is 'not very demanding.'" *Christensen*, 828 F.3d at 780 (quoting *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007)(en banc)). "An associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* (quoting *Odom*, 486 F.3d at 552). Courts have construed an "enterprise" as having three elements: "(1) a common purpose, (2) an ongoing organization, and (3) a continuing unit." *Id.*

---

[3] Harding also joins the motions made by other defendants. Harding's Joinder (Dkt. No. 1783).

### 2. Generally

Gordon argues that the evidence at trial was insufficient to establish an enterprise or racketeering conspiracy because there was no evidence that the defendants associated together for a common purpose that had an effect on interstate commerce. Gordon's Mot. at 5. "Under Supreme Court and Ninth Circuit precedent, establishing the existence of an associated-in-fact enterprise requires proof (1) of an ongoing organization, formal or informal, (2) which exhibits a hierarchical or consensual decision-making structure beyond that inherent in the alleged racketeering activity, and (3) in which the various associates function as a continuing unit." *Fernandez*, 388 F.3d at 1223 (citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Chang v. Chen*, 80 F.3d 1293, 1297, 1299–1300 (9th Cir.1996)). The *Fernandez* court elaborated, "[i]n order for a group of individuals to qualify as an enterprise, 'the [decision-making] structure should provide some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis.'" *Id.* (quoting *Chang*, 80 F.3d at 1299).

Gordon contends that the evidence at trial merely established that "certain defendants and individuals sometimes hung out together, communicated, socialized and occasionally committed alleged crimes together." Gordon's Mot. at 6. In response, the government argues that "[t]here was an abundance of evidence establishing beyond a reasonable doubt that CDP constituted a RICO enterprise conspiracy... ." U.S. Response at 4. At trial, the government sought to prove the existence of the charged enterprise as a group of individuals associated-in-fact through the testimony of cooperating witness JB, admissions in the recorded jail-house conversation between Young and cooperator Bruce Lee Marshall, various texts, and evidence of charged and uncharged acts involving CDP members that tie the defendants to each other and various unindicted "co-conspirators" and link the individuals to the charged enterprise.[4]

JB testified that he first became aware of CDP around the age of 10 or 11 because his

---

[4] Many of the uncharged acts were not racketeering acts under the statute. *See* Final Jury Instructions, No. 42 ("These acts include assault with a deadly weapon, maiming, possession of firearms, auto burglary, residential burglary, receiving stolen property, drug possession, intimidation of a witness in a state court proceeding, and prostitution.").

mother was raised in the area around Divisadero and Grove, he would see "members" hanging out near "grandmommy house[,]" and they would give him money. RT at 4432. That is when he "became curious of the group." RT at 4432:20. He testified that there is no "ceremony" or "jump[ing] in" process to become a member of CDP. RT at 4480.[5] He elaborated:

> Basically like I expressed, you grew up there, you was born in the area. The older people in the area, moms and dad knows my mother, my mom and grandmother. So we don't get jumped in. It's basically you're from here due to who your family is and where you grew up. We grew up there, so we don't have to get jumped in and be part of CDP.

RT at 4480:8–13. On cross-examination, Ferdinand's counsel asked if he was from the neighborhood, could he claim the "D." RT at 5209:15–21. JB told him "[n]o," because "[y]ou're not hanging with us, you're not committing crimes, you're – you're not involved in what we're involved in. You're not – you live there. You can't say you from there. It's unheard of." RT at 5209:22–5210:2. When pushed, he testified, "[y]ou have to know somebody. You have to be – you have to grow up there. You have to know – you have to hang around people. You have to have ties." RT at 5209:24–5211:2. When asked about various gangs associated with particular housing arrangements or blocks, JB testified:

> Some people claim the housing projects. KO is a housing project. Some people say I'm from KO. It's a housing project in the Fillmore that they claim. I'm from Mac Block. It's housing projects in Fillmore that they claim. That's their block. That's their neighborhood. It's a gang. They do crime and something they claim, yes. But it's housing projects, sir. Yes.

RT at 5212:2–8.

JB also explained that CDP had no formal organization or hierarchy, but "[c]ertain people have more rank than others[,]" "[c]ertain people can get stuff done more than others[,]" and "[c]ertain people ... that you have to listen to if they ask you to do something." RT at 5213:23, 5213:25, 5214:1–2. He testified that they had meetings, bought guns for each other, and regularly hung out at "grandmommy house." RT at 5214–5215. When asked to contrast CDP with "well-known gangs[,]" JB reiterated that they don't get jumped in, and there are no "street sign[s]" defining their area; rather, they "hang with each other" and "do crimes with each other." RT at

---

[5] RT refers to the Reporter's Transcript. *See* Master Index (Dkt. No. 1479-1).

5216–17. It is unnecessary to discuss the government's other evidence of the RICO enterprise;

JB's testimony alone provided sufficient evidence for the jury to conclude that CDP constituted a

RICO enterprise. *See Fernandez*, 388 F.3d at 1223; *United States v. Lopez*, 803 F.2d 969, 973

(9th Cir. 1986)("The uncorroborated testimony of an accomplice is enough to sustain a conviction

unless the testimony is incredible or unsubstantial on its face.").

### 3. Harding

Harding highlights numerous asserted gaps in the evidence linking him to the charged

enterprise, including the following:

- Overt Act x: the January 15, 2010 robbery of Colin Toerge's iPod on a public bus, to which Harding pled guilty, occurred outside alleged CDP territory; he was arrested outside of alleged CDP territory, and he was with two males that are not alleged to be CDP members;
- Arrest on August 27, 2013 for Receiving Stolen Property: location burglarized was not in CDP territory; at the time of arrest he was outside of CDP territory, with one individual alleged to be a CDP member and one that is not;
- Overt Act w: the October 6, 2009 attempt to intimidate a testifying witness was organized by defense attorney Eric Safire and was not intended to intimidate the witness;
- String of "Silver Van" Robberies between September 23, 2011 and October 5, 2011: no evidence that Harding committed any of these robberies, only that he returned one of the victim's sunglasses to Nordstrom's three days after they had been stolen;
- No evidence that Harding had gang-related tattoos, wore gang-related attire, made gang-related hand signs;
- No evidence that he possessed or used a weapon;
- No evidence that he frequented "Da Pitt" (alleged to be a frequent hang-out spot of CDP members), attended funerals of fallen members, or participated in rap videos with his co-defendants;
- No evidence that he was involved in any of the murders or attempted murders charged in this case;
- No evidence that he was involved in pimping.

*See* Harding's Mot. for J. of Acquittal at 3–4.

In response, the government underscores the following "axiomatic" principal: "(o)nce the

government establishes the existence of a conspiracy through independent evidence, only slight

evidence is required to connect a defendant with it." *United States v. Eaglin*, 571 F.2d 1069, 1077

(9th Cir. 1977)(quoting another source). And it contends that the jury was presented with

sufficient evidence of Harding's connection to the charged enterprise through the testimony of

cooperating witness JB. U.S. Response to Harding (Dkt. No. 1805). JB testified that Harding, on

two occasions, went with him and two others to Eddy Rock to shoot at rival gang members. RT 4757:13–24. He indicated that Harding "would just be there with us[,]" "he was walking with us, he was – he was accompanying – he was there. Like, he was with us during the whole time. He didn't shoot." RT at 4757:24–4758:3. And he did not carry a firearm. RT at 4758:4–5. The government argues that "[t]his testimony alone is sufficient to convict Harding of RICO murder conspiracy." U.S. Response at 4 n.1. But it also highlights the evidence of Harding's "RIP Chedda Boy" tattoo, his own statements associating himself with CDP, and his participation in concerted conduct with other alleged CDP members. *See id.* at 5–7.

JB testified that "Chedda Boy" refers to Aubrey Abrakasa, who he referred to as "a friend of ours that got killed, a gang member." RT at 4524:10–14. It is not entirely clear whether the government alleged that Abrakasa was a CDP member (this was not previously part of the theory of its case),[6] but the jury was presented with JB's testimony establishing that he was. *But see* RT at 4475 (referring to Abrakasa as "a friend of ours that got murdered" by Eddy Rock OC); RT at 4476–77 ("They took one of ours, basically, our generation. Like I expressed Aubrey was basically one of the group of people I hung around. He was in my age bracket, and I grew up with him. He lived across the street from my house, so we knew each other since little kids.").

I am confined to determining whether the evidence, when "considered most favorably to the government, was such as to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt." *Ramos*, 558 F.2d at 547. In this vein, Harding's conviction must stand even if it hinges only on the testimony of cooperating witness JB. "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury." *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970); *see also United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015)("It is well established that the uncorroborated testimony of a single witness may be sufficient to sustain a

---

[6] During closing arguments, the government cited to JB's testimony to argue, "I think that the evidence before you supports the fact that Aubrey Abrakasa was a gang member." RT at 9844:19–20. But it also equivocated a bit, and argued that it was "actually not the important question." RT at 9844:13; *see also* RT at 9844:3–11 ("[R]egardless of whether Aubrey Abrakasa was a gang member or not, you actually don't have to decide that. … he became a rallying cry for CDP. Whether he was a gang member or not, they certainly took it that way.").

conviction.")(quoting another source). Harding highlights various reasons to doubt the testimony of JB. But "[a]bsent facial incredibility, it is not [my] role to question the jury's assessment of witness credibility." *United States v. Tam*, 240 F.3d 797, 806 (9th Cir. 2001). The jury found JB's testimony credible, and convicted Harding of count one. The evidence was sufficient to sustain that conviction.

As the government points out, there was other evidence on which the jury may have relied besides JB's testimony. Harding's own statements tying him to CDP include two text messages to females including "237" (which JB explained corresponds to the letters for CDP on a telephone keypad, RT at 4525), messages with co-defendant Adrian Gordon concerning criminal activity, a message in which he attempts to purchase a firearm, and a recorded jail call in which he admits to being in "Central Street" gang. *See* Gov't Trial Exs. 549D-1; 632-11, -19, -20, 44, -45. The government did not offer any evidence that the women to whom Harding sent the texts were members or associates of the charged enterprise or its rivals. The messages between Harding and Gordon are incriminating with respect to independent criminal conduct and perhaps a conspiracy between the two, but they do not explicitly or implicitly reference CDP.

The government also relies on evidence of "other acts" tying Harding to CDP; namely, the "Silver Van" robberies, the August 2013 burglary, and the "witness intimidation" incident at the October 2009 preliminary hearing. Even though the jury was never asked to determine whether Harding participated in the "Silver Van" robberies, it could have used that evidence to tie Harding to concerted criminal conduct with co-defendant Gordon. But, as with the text messages above, the government offered no direct evidence that the "Silver Van" robberies were perpetrated in furtherance of the charged enterprise. Nor did it connect the August 2013 burglary to the CDP enterprise. As for overt act w (the incident at the October 2009 Preliminary Hearing), the jury heard conflicting evidence whether the act was intended to intimidate a witness, or whether it was an ill-advised plan by an attorney to sow doubt as to that witness's identification of Charles Heard. No one was charged or convicted of a crime related to the incident. That said, it certainly showed Harding's association with other CDP members. The jury could have relied on this evidence, in addition to JB's testimony, to determine that Harding knowingly associated himself with CDP.

#### 4. Gordon

Gordon argues that the government failed to prove his association with the charged

enterprise, and he highlights substantial contradictory evidence, including:

> - Mr. Gordon lived in KOP "territory" during the contentious time
> period (after 2008).
> - Mr. Gordon had a KOP and "RIP Dre" (for Andre Helton) tattoo.
> - Mr. Gordon was dating a woman from O.C. (an alleged rival area).
> - Mr. Gordon did not have any CDP tattoos or any other marks
> suggesting CDP membership.
> - There was no evidence that Mr. Gordon ever displayed any CDP
> gang signs.
> - Mr. Gordon's name was not alleged to have been on the "wall" at
> 1458 Grove St.
> - In all of the evidence presented, the only affiliation was the "237"
> on one of five phones associated with Mr. Gordon (and a phone
> shared with another person, at a minimum).

Gordon's Mot. at 6. The government responds that it presented sufficient evidence of Gordon's

association with the enterprise through his social media and text information, which explicitly

referenced "237," his "RIP" tattoos memorializing individuals that are included on the sheet of

"Uptown" graffiti, his criminal activity with other alleged members of CDP, the testimony of JB,

and Gordon's attempted murder of Patrick McCree. U.S. Response to Gordon at 4–8 (Dkt. No.

1803).

Gordon contends that there is insufficient evidence that he joined CDP knowing its

essential nature, scope, and purpose, and intending to facilitate it. But the jury heard JB's

testimony that, even though Gordon was in KO a lot when JB was growing up, as he grew older,

he considered Gordon "to be with us, a part of us." RT at 4445. He indicated that Gordon hung

with CDP more and "claimed my area." RT at 4445–46. He also testified that Gordon went with

him and others to Eddy Rock and shot at rival gang members.[7] RT at 4757. And the government

---

[7] Gordon underscores that JB hardly knew him, and did not mention his name to authorities for
more than one year. JB testified that the most amount of time he and Gordon were simultaneously
out of custody was approximately one month between July 2008 and December 2010. RT at
5385–87. These facts raise doubts that JB had personal knowledge as to Gordon's affiliations or
actions, but they do not render JB's testimony "incredible as a matter of law." *United States v.
Truman*, 688 F.3d 129, 140 (2d Cir. 2012); *see id.* (vacating the district court's judgment of
acquittal based on its error in substituting its judgment on witness credibility for that of the jury).
Because it is "the exclusive province of the jury to determine the credibility of witnesses[,]"
*Ramos*, 558 F.2d 546, these doubts do not justify a judgment of acquittal. Nor do these facts
justify granting a new trial.

highlights evidence that the attempted murder of Patrick McCree, of which Gordon was convicted, was perpetrated in furtherance of the gang rivalry between CDP and KOP. *See infra* discussion re: counts nine, ten, and eleven. Since the testimony of one witness is sufficient, *Katakis*, 800 F.3d at 1028, and the credibility of that testimony is strictly within the province of the jury, *Jackson*, 443 U.S. at 319, I must conclude that the evidence was sufficient to sustain Gordon's conviction for RICO conspiracy, knowing that its purpose was murder.

### 5. Young

Young argues that the government failed to present evidence that he knowingly joined or agreed to enter into a conspiracy. Young's Mot. at 4 (Dkt. No. 1784). He contends that the only evidence of his alleged CDP membership consisted of still photographs from rap videos with other alleged CDP members, and his name on a wall at 1458 Grove Street, the alleged "headquarters" of CDP.[8] *Id.* at 5. He highlights that cooperating witness JB testified that he only recognized Young's face, did not know whether he was a pimp, and did not know anyone from CDP who dealt with him. RT at 5425–5431. And Sergeant Jackson, who had patrolled the area for more than a decade, had only one contact with Young, which occurred in Fairfield, outside of San Francisco.[9]

But Young gives short shrift to the testimony of Bruce Marshall, the jailhouse informant. *See* Young's Mot. at 5. Marshall admitted to being a "pathological liar," which may have led the jury to approach his testimony with skepticism. RT at 3678:4–9. But the government also offered a recorded conversation in which Young discussed the status of the RICO case against his co-defendants, his concern that he might be linked to that case, the quality of evidence against the individuals charge with the "pimp case" [the Calvin Sneed homicide] versus the other RICO defendants, his advice about how to hide guns and drugs, his criticism that others were sloppy in maintaining their drugs and weapons, the Acura speeding from the scene of the Gravity Bar the

---

[8] Young emphasizes that the government acknowledged that the wall is "not a gang roster... . There are a lot of different names on that wall." RT at 9892:5–10.

[9] The contact occurred on July 4, 2012. Young was one of many people at Fourth of July festivities when Sergeant Jackson served co-defendant Alfonzo Williams with an arrest warrant. RT 7379:1–7380:9.

night Jelvon Helton was murdered, and  that he knew people with "thirty confirmed" in contrast

with his "two or three," which "ain't shit."  Ex. 832.

The government also cites to the testimony of AW, one of Young's pimping victims, who

testified that Young took her to Las Vegas in 2012 with CDP member Tyrice Ivy, and once there,

directed her to prostitute herself.  RT at 1985–86.  AW first met Young near the end of 2010 or

beginning of 2011, when she was eighteen.  RT at 1963.  In the beginning, the relationship "was

really good.  He was extremely nice, very charming[,]" and they did "normal dating things."  RT

at 1964:20–1965:1.  AW was in school and working part-time at Starbucks during the early part of

their relationship.  RT at 1965.  But she needed more money to support her family, including her

mother who had cancer, and Young encouraged her to start stripping so she could make more

money.  RT at 1966.  He bought her shoes and outfits and told her to go to a club that would hire

her as an eighteen year-old dancer, which she did.  RT at 1967.  When her family found out, she

got kicked out of the home and sometimes stayed with Young and sometimes stayed with friends.

RT at 1968.  She testified that she wasn't always able to keep the money she made dancing or give

it to her family because Young would ask for it or tell her she had to give it to him.  RT at 1968–

70.  And it "eventually became pretty customary."  RT at 1970:20.

There came a time, approximately a year and a half into the relationship, when he expected

her to do more than just dance to earn money for him.  RT at 1973.  In May 2012, Young took

AW to Las Vegas for the Mayweather fight, where they met up with Young's friend and his

friend's girlfriend.[10]  RT at 1974–75.  It became clear that AW was expected to walk around with

the friend's girlfriend, "hang out" with people and make money, and "[i]f it came down to it, you

would have sex with them."  RT at 1975–76.  The first night, a group of men paid each of the

women $15,000 to hang out with them and have sex.  RT at 1978.  Young took $8,000 and she

kept $7,0000.  RT at 1979.  The second night she made a couple thousand dollars and gave "a

little" of it to Young.  RT at 1980.  After they returned to San Francisco, Young continued to

direct her to have sex with men for money.  RT at 1982.  She also testified that Young took her to

---

[10] She later identified Young's friend as "Ty" on the government's trial exhibit 43.  RT at
1989:18–25.

the barbeque pit where he would leave her in the car for thirty to forty-five minutes. RT at 1982–84. Sometimes he would go into the barbeque pit and sometimes he would walk up the street. RT at 1984–85. He told her he had "meetings with his friends… ." RT at 1986:3. He left her in the car "[a]t least a dozen" times, and "five, maybe six" times, he said he was meeting with friends. RT at 1986.

The government also highlights text messages between Young and Carmichael days after the Levexier homicide, Ex. 1805a, and his connection with co-defendant Esau Ferdinand, who he referred to as his "cousin." Ex. 832. And Young's car was seen fleeing the Gravity Bar the night Jelvon Helton was murdered there. The government introduced evidence that this murder, which Young was convicted of committing, was perpetrated in furtherance of the gang rivalry between CDP and KOP.

Viewing this evidence in the light most favorable to the government, a rational trier of fact could have found that Young knowingly joined the RICO conspiracy.

### C.    Multiple Conspiracies or Single Overarching Conspiracy

Harding argues that count one must be dismissed because it charges multiple agreements to commit separate crimes as an end in themselves, as opposed to a single overarching conspiracy. Harding Mot. at 13–17. The government counters that Harding's argument fails "when considered in the context of RICO conspiracy." U.S. Response at 9. It underscores a 40 year-old decision from the Fifth Circuit: "Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir. 1978). The defendants contend that the evidence does not allow for the reasonable inference that each crime was intended to further the affairs of CDP. As the *Elliott* court noted, "[t]o find a single conspiracy, we still must look for agreement on an overall objective." *Id*. at 903.

To meet its burden on this charge, the government stresses JB's testimony that different CDP members were involved in different criminal activity, and that they shared the proceeds from their crimes and shared firearms to facilitate their criminal activity. JB testified that having more

money did "[n]ot necessarily" mean having more respect within the group.  RT at 4437.  But Alfonzo Williams "helped us within the group.  He would give us money to buy guns.  He will buy us shoes.  He will – basically the money he had, he will help us within the gang.  If we had an issue, he will give us money to solve it.  So that's why we respect him, because the money he gave us was – was benefitting the gang.  If we needed a gun, he will pay for it if we don't have no money."  RT at 4437–38.  He explained that other members also helped him out: "Cheese will give me money.  Julius, Fella, Reg, Tit.  Basically it was a group thing.  If I didn't have it, they will give it to me if they had it.  So they will basically help me out.  And I will help them.  We came – we became dependent upon each other."  RT at 4440:19–4441:2. When asked whether he did anything to make more money for the group, he testified that he "[s]old drugs, like I expressed.  I worked a job.  I'll rob people."  RT at 4438:14–17.  He explained that he committed crimes with his "group, the younger generation [of CDP]… ."  RT at 4439–40.  And, if he got a lot of money, he would share it with other CDP members.  RT at 5600.

He also explained the alliance between Knock Out Posse ("KOP" or "KO"), Divisadero, and Chopper City, "all considered 'Uptown[,]'" and "all together against OC, which is Eddy Rock[,]" considered Downtown or "[d]own away."  RT at 4442–48.  These alliances allowed members to go to certain areas and "kick it and hang out[.]"  RT at 4443.  And he testified that shooting or killing a rival gang member would get you more respect.  RT at 4438.  He indicated that the members would share guns, which they would hide at the barbeque pit, or in the housing projects with "more people" and "places we can stay… ."  RT at 4444, 4446–48; *see also* RT at 4603–06 (describing a particular robbery with Elmore and Ferdinand and how they kept the gun as CDP).

Given JB's testimony regarding the broad scope of the agreement between CDP members and allies, one can "reasonably infer" that count one includes acts which comprise a single overarching conspiracy.  *Elliott*, 571 F.2d at 902–03; *see also United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001) ("Even if the evidence arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the

16

indictment.").

**D.    Whether the Interests of Justice Require a New Trial on Count One**

Gordon argues that three evidentiary and procedural errors justify a new trial as to the counts against him. Gordon's Mot. at 9. First, he contends that the denial of his motion in limine to exclude evidence of the uncharged Donte Levexier murder so infected the trial that the interests of justice require a new trial as to all the counts against him. Second, he insists that I erred in denying numerous motions to sever Young from the remaining defendants. And third, he urges that the jury instruction on RICO conspiracy was erroneous. Harding also argues that I erred by allowing voluminous evidence of uncharged acts. I will begin with this contention, since it goes to the core of how the government proved its case.

**1.    Evidence of Uncharged Acts**

Harding contends that the case against him "was made with voluminous, prejudicial, and largely irrelevant evidence of uncharged conduct... ." Harding's Mot. for New Trial at 7. The government relies on a Second Circuit decision to support its position that uncharged acts were properly admitted in this case.

> [P]roof of the enterprise and pattern elements of racketeering "may well entail evidence of numerous criminal acts by a variety of persons." [citation] A single pattern of racketeering may be common to a number of defendants and, in such circumstances, even though individual defendants "may reasonably claim no direct participation" in the acts of others, "evidence of those acts is relevant to the RICO charges against each defendant." [citation] Specifically, the "various criminal activities" of racketeering confederates are admissible against each defendant "to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."

*United States v. Basciano*, 599 F.3d 184, 207 (2d Cir. 2010)(quoting *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992)). As I concluded in the Omnibus Order on Motions in Limine, the government was permitted to prove the association-in-fact of the defendants through evidence of uncharged acts. While those uncharged acts may have been prejudicial, they were not unfairly prejudicial, and they certainly were not irrelevant. The interests of justice do not justify granting a new trial on this basis.

### 2. Evidence of Donte Levexier Homicide

Prior to trial, Gordon moved to exclude evidence of the Donte Levexier homicide as (1) improper Rule 404(b) evidence, (2) lacking the sufficiency of the evidence under Rule 104(b), and "(3) exceedingly more prejudicial than probative, particularly with the lack of reliable evidence that Mr. Gordon was involved." Gordon's Mot. at 10. At trial, Gordon introduced evidence from which the jury could have inferred that he was not at the location of the Levexier homicide at the time of the homicide. Given this alleged alibi, Gordon argues that evidence of the brutal homicide "is highly likely to have prejudiced the jury and been used for an improper purpose (such as propensity)... ." *Id.*

The government counters with its own evidence; namely, testimony from JB identifying Gordon as an individual seen in surveillance footage from a house nearby the location of the Levexier homicide. JB testified that he recognized the individual based on his walk, although he could not say for sure that it was Gordon, since he could not see his face. RT 4756–57. The government also highlights a jail call between Gregory Walker, Kia Horace, and Gordon, the day after the Levexier homicide, in which they purportedly celebrate Levexier's death. Levexier was allegedly responsible for shooting at Walker and Horace on an earlier occasion, leaving Horace paralyzed from the attack. According to the government's theory, "Greg Walker reflected on the fact that Gordon killed a member of his own family [Levexier was his cousin] to avenge the attack where her [sic] and Kia Horace were shot." U.S. Response at 11. Gordon insists that nothing in the jail call transcript advanced the government's theory that Gordon was actually involved in the Levexier homicide.

The testimony and evidence related to the uncharged Levexier homicide consumed a significant amount of time and included horrific photographs and heart-wrenching testimony from a mother who lost her son. In all likelihood, it had an effect on the jury. But the broad scope of the charged criminal conspiracy allowed the government to offer evidence of acts that were "inextricably intertwined" with the enterprise. In the Omnibus Order on Motions in Limine, I denied the defendants' motions to exclude evidence of two uncharged acts, the Levexier homicide and the Turk Street shootout, because, according to the government's theory, they were

"inextricably intertwined" with the charged conspiracy and therefore not subject to Rule 404(b) strictures. Omnibus Order on Motions in Limine at 18–19. As for the Levexier homicide, I specifically noted that "the murder of an alleged gang rival is highly probative of the affairs of the enterprise[,]" so "[i]ts probative value is not outweighed by the 403 dangers." *Id.* at 19.

Nothing in Gordon's motion alters my prior conclusions regarding the admissibility of this evidence. He cites to *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997), for the proposition that "evidence in a murder trial that the defendant committed another prior murder poses a high risk of unfair prejudice." *Id.* at 319. In *Murray*, the Third Circuit held that "the district court abused its discretion in concluding that any legitimate probative value possessed by this evidence was not substantially outweighed by the danger of unfair prejudice." *Id.* But, unlike in *Murray*, the evidence of the Levexier homicide was relevant to prove the gang rivalry between CDP and KOP, not Gordon's "homicidal character." *See id.* at 316 ("In this case, therefore, Rule 404(b) barred Stukes' testimony if it was relevant only to permit the jury to infer that Murray had a homicidal character and that this character found expression in the murder of Bacallo."); *id.* at 317 (rejecting the government's theory that the uncharged murder showed the defendant's role in the conspiracy because there was no evidence that the uncharged murder was "in any way related to the charged [continuing criminal enterprise].").

In the government's estimation, the Levexier homicide was relevant and probative of the gang rivalry because it was a CDP-related homicide of a KOP member. It offered evidence in support of its gang rivalry theory, and it was entitled to present that theory to the jury. The jury heard that evidence, as well as Gordon's alibi evidence. Given the evidence's relevance to the overarching RICO conspiracy and corresponding probative value, Gordon was not unfairly prejudiced by its admission. *Cf. id.* at 320 ("We cannot disregard the possibility that the evidence of the New York murder 'weigh[ed] too much with the jury and ... so overpersuade[d] them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.'").

### 3. Young's Severance From Ferdinand

Gordon argues that the conflict between Ferdinand and Young led to Ferdinand having to

cross-examine Young's witnesses, which was "confusing, harmful, and overly prejudicial for the jury… ." Gordon's Mot. at 11. But Gordon offers no cases in support of his position, and he fails to convince me that I improperly denied the repeated requests to sever Young from the first trial group. Below, I address and reject Young's argument that the denial of his severance prevented him from presenting a full defense, and Ferdinand's argument that Young's strategy "damned" him. *See infra* section IV.A. My ruling had no effect on the trials of Gordon, Harding or Heard.

### 4. RICO Conspiracy Jury Instruction

Gordon cites to the Ninth Circuit's recent unpublished decision in *United States v. Young*, 720 F. App'x 846 (9th Cir. 2017), to argue that the RICO Conspiracy jury instruction "did not accurately state the culpability required for a criminal conviction under this statute."[11] Gordon's Mot. at 11. In *Young*, "[t]he district court instructed the jury that the government must prove that Young 'conspired and agreed' that he 'or a co-conspirator, would conduct or participate, either directly or indirectly, the conduct of the affairs of the enterprise through a pattern of racketeering activity.'" *Id*. at 849. The Ninth Circuit concluded that this instruction was "contrary to *Fernandez*," and therefore plainly erroneous because "they do not explain what the defendant, not a co-conspirator, needed to agree to do in order to be found criminally culpable as a conspirator." *Id*. at 850 (citing *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (internal quotation marks omitted)). While *Young* is unpublished and lacks precedential value, I will consider the arguments Gordon raises.

I instructed, in part,

> In order for a defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:
> First, the charged enterprise—which is CDP—was or would be

---

[11] The government's argument that this issue is unreviewable on appeal because none of the defendants "made this claim" during charging conferences is not well taken. *See* U.S. Response at 14. Neither the government, nor the defendants cited to *Young* in their proposed jury instructions, and I was unaware of the decision; thus, there is no basis for finding that defendants waived their right to challenge this instruction. *See United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997)("Waiver occurred in each of these cases because the defendant considered the controlling law, or omitted element, and, in spite of being aware of the applicable law, proposed or accepted a flawed instruction."). As in *Perez*, defendants here forfeited—but did not waive— their challenge to this instruction because they failed to object, in which case the potential error is reviewed for plain error on appeal. *Id*. at 846.

established;

> Second, the enterprise or its activities would affect interstate or foreign commerce;
>
> Third, the defendant knowingly agreed that either the defendant or another person would be associated with the enterprise; and
>
> Fourth, the defendant knowingly agreed that either he or another person would conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

Final Jury Instructions, Jury Instruction No. 28, Count 1: Racketeering Conspiracy—Elements

(Dkt. No. 1768 at 32). Gordon initially focuses on this portion of the instruction enumerating the

requisite elements. Only in Reply does he acknowledge the rest of the instruction:

> In order for you to convict a defendant of RICO conspiracy, the government must prove beyond a reasonable doubt that the defendant agreed to participate in the enterprise with the knowledge and intent that at least one member of the racketeering conspiracy would intentionally commit, or cause, or aid and abet the commission of, two or more racketeering acts. That one member could be the defendant himself, or another person. You must unanimously agree on at least two racketeering acts the defendant understood would be committed. The government is not required to prove that defendant personally committed, or agreed to personally commit, two or more racketeering acts.
>
> In order to find a defendant guilty of racketeering conspiracy, the government must prove beyond a reasonable doubt that the defendant joined the conspiracy knowing the conspiracy's purpose and intending to facilitate it. The defendant must also know the essential nature and scope of the enterprise.

*Id.* These last two sentences adequately "explain what a defendant, not a coconspirator needed to

agree to do in order to be found criminally culpable as a coconspirator." *Young*, 720 F. App'x at

849–50.

Gordon insists that the "intending to facilitate it" language does not accurately encompass

*Fernandez*'s mandate that "[a] defendant is guilty of conspiracy to violate RICO only if the

evidence shows that the defendant knowingly and personally 'agreed to facilitate a scheme which

includes the operation or management of a RICO enterprise.'" *Id.* at 850 (quoting *United States v.

Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)). According to Gordon, "[o]ne's intent that a

particular thing should occur is not the same as taking *action* to support or facilitate those who are

operating the enterprise." Reply at 10. But a section 1962(d) violation does not require action, it

requires agreement. *Salinas*, 522 U.S. at 65 ("A conspirator must intend to further an endeavor

which, if completed, would satisfy all of the elements of a substantive criminal offense, but it

suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion."); *see also Christensen*, 828 F.3d at 780 ("[A] RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'")(quoting *Fernandez*, 388 F.3d at 1230). The RICO conspiracy charge adequately instructed the jury as to the mental culpability required to convict each defendant.

Even if the instruction was not erroneous, Gordon contends that a new trial is warranted because it was "fatally ambiguous." An ambiguous jury instruction may rise to the level of a due process violation if it allows the government to convict a defendant for an offense without proving every element of the offense. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id*. (internal quotation marks omitted). Gordon urges that "[t]he Court should act at this opportunity and juncture and correct the error by granting Mr. Gordon's motion for a new trial... ." Gordon Mot. at 13. I do not think that the instruction was ambiguous. Moreover, a motion for a new trial should only be granted under "exceptional circumstances in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). Those circumstances do not exist here.

## II.     OTHER COUNTS AGAINST GORDON (COUNTS 9, 10, 11)

Gordon argues that the evidence at trial was insufficient to establish that the Patrick McCree shooting was "an act for purpose of gaining entrance to/maintain or increase position in CDP." Gordon's Mot. at 7. He highlights that "it was *never* established who the alleged second shooter was or whether that person had *any* connection to CDP." *Id*. (emphasis in original). He also emphasizes that it was this second shooter who actually shot McCree.

The government counters with evidence that the shooting was an orchestrated component of the gang rivalry between KOP and CDP. Specifically, it highlights McCree's connection to Levexier (through his presence at Levexier's mother's house the night Levexier was murdered, the

fact that Levexier and McCree were seen in a car together, and McCree's relationship with Levexier's sister), Ferdinand's text-message taunts regarding Levexier's murder and McCree's attempted murder, and JB's testimony that killing a rival gang member would get a member more respect. U.S. Response at 8–10. Gordon challenges the probative value of the evidence connecting McCree to Levexier, and highlights other evidence that he was friendly with the victim's brother both before and after the shooting and that McCree was from an area alleged to be aligned with CDP. Gordon Reply at 3. He also underscores the lack of any evidence that shooting McCree would advance one's status in CDP, and more importantly, his own status in CDP. *Id.*

It is possible that the McCree shooting was unrelated to the gang rivalry between CDP and KOP, but a mere possibility does not justify a motion for judgment of acquittal. I am tasked with viewing the evidence in the light most favorable to the prosecution, and determining if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). A rational juror could have found the requisite elements, including the element that the attempted murder was committed to maintain or enhance Gordon's position in CDP, through JB's testimony that shooting at rival gang members garnered more respect.

### III.    OTHER COUNTS AGAINST HEARD (COUNTS 8, 9, 10)

Heard argues that he is entitled to a new trial under Federal Rule of Criminal Procedure 33 on the grounds that "his due process rights were violated when the Government (1) knowingly solicited, affirmed, and failed to correct testimony by Francis Darnell which the Government knew to be false, and (2) failed to investigate and correct the false testimony of [cooperating witness] JB regarding his claimed robbery of Salvador Villalobos (a.k.a. City Shine), even though the Government was specifically informed that Mr. Villalobos had confirmed in an interview … that he was robbed *only once*, and that the robbery occurred in August 2008, *after* Andre Helton was murdered." Heard's Mot. for a New Trial Based on *Napue* Violations at 1 (Dkt. No. 1781). A court may grant a defendant relief under Rule 33 under circumstances that amount to less than a constitutional deprivation. *See* Fed. R. Crim. P. 33 ("... the court may vacate any judgment and grant a new trial if the interest of justice so requires."). I will look to the standards governing

United States District Court
Northern District of California

*Napue* claims in the habeas context to guide my analysis.

### A. Legal Framework

In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court acknowledged the established principle that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and noted that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 269. It further found that this principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Id.* In addition, the Ninth Circuit has noted that "[t]here is some support for [the] view that accurate testimony could be delivered in a sufficiently misleading context to make the evidence false for *Napue* purposes." *Towery v. Schriro*, 641 F.3d 300, 309 (9th Cir. 2010). "To establish a *Napue* claim, a petitioner must show that '(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) ... the false testimony was material.'" *Id.* at 308. The materiality standard for *Napue* errors is "less demanding" than ordinary harmless error review, it is determined by ascertaining "whether 'there is any reasonable likelihood that the false testimony *could* have affected the judgment of the jury.'" *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013)(quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added)).

### B. Testimony From Francis Darnell Regarding Overt Act u

Heard argues that the government violated his due process rights by "presenting, affirming, and failing to correct the false testimony of Francis Darnell." Heard's Mot. at 7 (capitalization omitted). In the SSI, the government alleged as an overt act in furtherance of the RICO conspiracy, that "[o]n or about November 25, 2008, Charles Heard killed Richard Barrett." SSI, Overt Act u (Dkt. No. 139 at 13). At trial, the government called eyewitness Francis Darnell and elicited her testimony that she saw Heard assault and shoot Mr. Barrett. RT at 6082–6136. Heard underscores the re-direct examination:

> Q. [By AUSA Barry] … I'd like to ask you some questions about your view, not of the videos, but what you saw with your own eyes the night of the murder.
> A. Okay.

> Q. Did you have a direct view of Charles Heard when the gun came out?
> A. Yes.
> Q. Was this before or after the victim moved?
> A. Before -- well, after -- after the victim moved, I had a clear shot of him for a brief moment.
> Q. Okay. And then did you have a direct view of Charles Heard after you heard the gunshots?
> A. Yes.
> Q. Did you lock eyes with Charles Heard?
> Mr. Vermeulen: Objection, Your Honor. Characterizing the shooter as Charles Heard is assuming something.
> THE COURT: Overruled. You can answer.
> By Mr. Barry: Q. Did you lock eyes with Charles Heard?
> A. Yes.
> Q. You were able to see his face, obviously?
> A. Clearly.

RT at 6197-6198.

Heard contends that "[t]his testimony was false and the Government knew it was false." Heard Mot. at 8. He bases this contention on testimony from San Francisco Police Department Sergeant/Gang Task Force Officer Damon Jackson (the government's gang expert in this case) that two individuals captured on nearby surveillance camera video footage were Greg Walker (a.k.a. Fella) and Dennis Anderson (a.k.a. Giggs), not Heard. This knowledge is attributable to the prosecution. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995)("This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). In addition, the government's cooperating witness JB corroborated Sergeant Jackson's identification. RT at 5627 (testifying that the two people in the surveillance video were not Charles Heard).

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The government insists that it "did not elicit false testimony from Francis Darnell." U.S. Response at 17 (capitalization omitted). It frames Darnell's testimony as "conflicting" with other government witnesses, and explains this conflict as "discrepancies flow[ing] from differing recollections or matters of perception." *Id.* at 17–18. It underscores its good faith in presenting Darnell's testimony.

The government's good faith does not defeat a *Napue* claim. *Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir. 2010)("A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness."). The relevant inquiry is whether Darnell's testimony was "actually false." She certainly believed her testimony was truthful, and she testified on cross-examination that additional information regarding the identity of the individuals in the surveillance video would not change her mind. RT at 6191. Nothing in the record establishes that her testimony was "actually false." Sergeant Jackson and JB identified other individuals in the surveillance video footage, and the other eyewitness testified that he did not believe Heard was the shooter. But this evidence does not conclusively establish that Heard was not the shooter, so it does not render Darnell's testimony false. The government was permitted to elicit Darnell's "conflicting" testimony, even if it did run counter to other evidence. Since Heard cannot establish that Darnell's testimony was "actually false," his *Napue* claim must fail.

### C. Testimony from JB Regarding City Shine Robbery and Motive for Andre Helton Murder

Heard argues that a critical portion of JB's testimony concerning the murder of Andre Helton was false. A brief background is necessary to place the testimony in context. JB testified that in the past, Elmore "was cool" with KO gang member Andre Helton, who he referred to as "Baby Bin," but that changed after they got in a fight. RT at 4779–80. According to JB, he, Elmore, and Demisse (a.k.a. Dips) robbed a chain and a gun from a Sixth Street gang member named City Shine, who was cool with Baby Bin. RT at 4780–81. The robbery took place at a gym on Sixth Street, and although a gun was involved, no one got shot. RT at 4782, 4919. After the robbery, Baby Bin "became involved," kept calling them and telling them to give the chain back. RT at 4782. JB testified that the calls made Elmore feel "angry" and "disrespected," in part because he believed Helton should support fellow gang members from Uptown, rather than City Shine. RT at 4782–83. After the robbery, there was a fight in which Baby Bin and Beefy, another KO member, "got the best of" Elmore. RT at 4783.

This falling out between Elmore and Andre Helton, prompted by the robbery of City

Shine's chain, purportedly provided a motive for Elmore to murder Helton. RT at 4916, 4920. During cross-examination, Heard's counsel attempted to pin down the timing of this robbery and place it in context of the August 14, 2008 double homicide. RT at 4921. JB did not know the date of the robbery; he could not recall the year, but said "[i]t was close" to Baby Bin's murder. RT at 4922–23. When presented with a police report indicating that City Shine was robbed of his chain at the Sixth Street gym on August 20, 2008—6 days after Baby Bin was murdered—JB testified that "[t]he robbery [he] took part in, we didn't get caught. There was no police report." RT at 4923–25. And, in fact, JB was in jail between April 30 and August 26, 2008. RT at 4926. So JB was forced to acknowledge that the robbery he took part in had to have happened at least five months before Andre Helton was murdered. RT at 4927.

Following this testimony, a defense investigator working on behalf of Elmore contacted City Shine, who reported to the investigator that he had been robbed once and the robbery occurred about one week after Helton's murder. Compton Decl. (Dkt. No. 1781-1). On January 8, 2018, Elmore's counsel emailed the government a letter citing to *Napue*, identifying JB's "lie," reporting the timeline, and relaying the information from City Shine that he had been robbed once about a week after Helton's murder. 1/8/18 Letter from Elmore's Counsel to the Government (Heard's Mot., Ex. A). The government responded to the letter with an email:

> In case it wasn't clear, let me say unequivocally that we believe the cooperator is testifying truthfully and accurately – despite the recent defense attempt to muddy the waters with a completely different robbery committed by someone else while the witness was in jail. If you have additional information you think we should be made aware of, please feel free to send it along. But I take issue with you making such an inflammatory and unsubstantiated accusation in the middle of trial.

1/8/18 Email from Government to Elmore's Counsel (Heard's Mot., Ex. B).

The government insists that JB's testimony was not false. According to it, JB "steadfastly maintained" that there were two robberies—one in which he participated that was never reported to the police and no one was shot, and another, in August 2008 and documented in a police report, during which City Shine was shot. Beginning May 20, 2010, in his first formal proffer session with counsel, JB told a consistent story of the City Shine robbery in which he was involved. *See* 5/20/10 FBI CHS Reporting Document (Joiner Decl., Ex. A [under seal]). JB even explained that

United States District Court
Northern District of California

the chain was eventually sold back to City Shine. *Id.* On cross-examination, he testified that City

Shine "was a target" because "[h]e had a chain" and "the first time he didn't do anything." RT at

5319. Under these circumstances, JB's testimony cannot be deemed "actually false." *See United*

*States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) ("The fact that a witness may have made an

earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does

not establish that the testimony offered at trial was false."); *United States v. Williams*, 547 F.3d

1187, 1202 n.13 (9th Cir. 2008)("Although there were inconsistencies in Penate's testimony, there

was no evidence that the government knowingly presented false testimony."). This is particularly

true where, as here, any inconsistencies are presented to the jury. *Williams*, 547 F.3d at 1202 n.13

("The inconsistencies in Penate's testimony were argued to the jury as the finder of fact.").

Regardless of the falsity of JB's testimony, Heard argues that the letter from Elmore's

counsel triggered a duty to investigate under *Napue* and its progeny.

> A prosecutor's "responsibility and duty to correct what he knows to
> be false and elicit the truth," *Napue,* 360 U.S. at 269–70, 79 S.Ct.
> 1173, requires a prosecutor to act when put on notice of the real
> possibility of false testimony. This duty is not discharged by
> attempting to finesse the problem by pressing ahead without a
> diligent and a good faith attempt to resolve it. A prosecutor cannot
> avoid this obligation by refusing to search for the truth and
> remaining willfully ignorant of the facts.

*Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117–18 (9th Cir. 2001).

The government insists that it did "investigate." It immediately requested additional

information from Elmore's counsel, and it obtained investigative reports concerning the robbery

and shooting of City Shine in August 2008. *See* SFPD Chronological of Investigation (Joiner

Decl., Ex. D [under seal]). The report, as well as officer testimony, indicated that City Shine was

uncooperative with police investigators. *Id.*; *see also* RT at 9138–39, 8446. The government also

underscores that City Shine's name appeared on the defense witness list, so it anticipated having

the opportunity to question him on the stand, but the defense never called him to testify. U.S.

Response at 13. Under these circumstances, Heard's claim under *Bowie* must fail.[12] *See, e.g.,*

---

[12] In response to Heard's motion, the government focuses on the "mountain" of evidence
corroborating JB's testimony of how Elmore told him the double murders occurred. U.S.
Response at 1–5. And it emphasizes that "[t]he present dispute resolves around a single aspect of
Elmore's admissions to JB." *Id.* at 6. According to the government, even portions of this "single

*United States v. Inzunza*, 638 F.3d 1006, 1021 (9th Cir. 2011)(rejecting *Bowie* claim where witness's "memory failure and pro-prosecution bias gave rise to credibility problems," but "the prosecution did seek out and find evidence to corroborate the testimony."); *United States v. Munoz*, 2009 WL 10700741, at *7 (C.D. Cal. Aug. 19, 2009) ("*Bowie* does not require that the government conduct an investigation simply because there are inconsistencies in a witness's pretrial statements.").

Defense counsel cross-examined JB for five days, repeatedly attacking his credibility on many matters, the City Shine robbery chief among them. The jury was able to evaluate the reliability of his testimony and clearly found him credible. Since Heard is unable to establish that either JB's or Darnell's testimony was "actually false," he cannot demonstrate that he is entitled to a new trial based on *Napue*.

## IV. COUNTS AGAINST YOUNG

### A. RICO Conspiracy (Count 1), VICAR Murder of Jelvon Helton and Related Counts (Counts 18, 19, 20)

As previously addressed on many occasions, I denied Young's motion to sever because his defense to the murder charge was not mutually exclusive to Ferdinand's defense. *See, e.g.*, Dkt. No. 1409. Young argues that he was prevented from presenting a complete defense to the RICO conspiracy and murder charges because I did not sever him from Ferdinand and because I limited his use of Tierra Lewis's prior inconsistent statements identifying Ferdinand as the shooter.

Two weeks after Jelvon Helton's murder in November 2010, Ms. Lewis went to the police station and relayed a story to Inspector Cunningham in which she was present at the Gravity Bar the night of the murder, and she saw Ferdinand pull out his gun and shoot Jelvon Helton. Ms. Lewis testified that she went to SFPD at the behest of Jelvon Helton's aunt, who wanted her to report that she knew who shot Jelvon. RT at 9034; RT at 9106–07. She also testified that everything she told Inspector Cunningham at SFPD was a lie, and she told Young's counsel when they met in October 2017 that she had been lying. RT at 9074–79; *see also* RT at 9102. Young

---

aspect" were corroborated by other evidence. For instance, Heard was recorded on a July 16, 2008 wire intercept discussing a fight involving "Reg" (Elmore), and the possibility that he might sell jewelry back to the person he got it from.

chose to defend himself against the murder charge by relying on her initial police identification.

During Young's examination of Ms. Lewis, she testified that she was never at The Gravity Bar; she was in Walgreen's with her cousin, who received a phone call from Ferdinand saying to pick him up in East Bay. RT 9040–9044. In 2010, she told Inspector Cunningham that she saw someone named "Nut Cake" with Ferdinand that evening, and she knew him from the neighborhood. RT 9048:2–12. At trial, however, she testified that Ferdinand arrived in Oakland in a car with another individual that she identified as "[y]our client." RT at 9044–45. When Young pressed that she had not previously relayed this information to SFPD or the defense investigator, she responded, "It's not my fault that at that time when y'all showed me a picture of your client I didn't know who he was because y'all showed me an old picture, and when I got here, I know him." RT at 9045–46. She claimed that she had seen him "[t]wo--two minutes, the longest[,]" and had never seen him previously.[13] RT 9047:15–9048:1.

As she testified, her "anger," as Young calls it, *see* Mot. at 7, was palpable. He urges that this anger stemmed from her fear at having to testify in a proceeding with Ferdinand present; there are other possibilities.[14] She expressed frustration because Young's counsel "never called back[,]" she suggested that he "didn't care about [her] health issue[,]" and repeated that her November 2010 statements were not true. RT 9062–64.

Ms. Lewis's story changed dramatically between 2010 when she went to SFPD and 2018, when she took the stand. But not all of it was a surprise to Young. In 2017, Ms. Lewis relayed to

---

[13] She later testified that she "remember his face from growing up in the neighborhood." RT at 9072:20–21. And still later, that "[h]e had his back turned" in reference to seeing Young in the car with Ferdinand when she went with her cousin to meet Ferdinand in the East Bay. RT at 9107:24–9108:5. The jury heard this conflicting testimony, and it saw the photographs of Young that she claimed were too old for her to recognize him.

[14] Young spends much time discussing Ms. Lewis's reluctance to testify at trial, and specifically, at a trial with Ferdinand present. Young's Mot. at 6–7. I had to issue an order authorizing her arrest for her to comply with the subpoena to appear. RT at 9023:13–16. She admitted to being "upset" and having "no choice" about testifying. RT at 9023:11–12, 9054:2–4, 9064:17–23, 9086:12–13. The jury heard this testimony, and it saw the threatening text messages that she received the day after she reported to police that Ferdinand shot Helton. *See* Ex. 783. But it also heard her explain that "[t]hese messages don't have nothing to do with this." RT 9025:8. She testified that the messages were related to a murder investigation involving her cousin and that they had no connection to Ferdinand. RT 9100. The jury had the opportunity to examine Ms. Lewis on the witness stand, listen to her testimony, and decide which version of events to believe.

Young's investigator that she would deny her 2010 statement and that she "was going to tell the truth." RT 9052:12–22; *see also* RT 9054 (relaying to Young's defense team in November 2017 that part of the November 2010 story was a lie); RT 9057 (reiterating in February 2018 that she was not at the Gravity Bar in November 2010). Armed with this knowledge, Young proceeded to call Ms. Lewis to testify at trial. Yet he argues that the presentation of her testimony at a trial with Ferdinand severely prejudiced him.

In his motion for a new trial, Young does not explicitly argue that his defense was mutually exclusive to Ferdinand's, which was the basis for his initial severance motion. This is because his defense was not mutually exclusive. "Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991). First, Ferdinand was not charged with the crime at all, so Young's acquittal "would not necessarily call for the conviction of the other." Second, Young knew that the jury would be instructed on *Pinkerton* liability, so even if the jury believed that Ferdinand shot Helton, other evidence would allow it to convict Young of the crime under *Pinkerton*. Young contends that in the absence of insight into the basis for the jury's decision to convict him for the Jelvon Helton murder, there are no grounds to find any error harmless due to *Pinkerton*. I disagree. Under these circumstances, Young's defense was not mutually exclusive with Ferdinand's, and their joinder was not so prejudicial that the interest of justice requires a new trial. *See Pimentel*, 654 F.2d at 545 (noting that a motion for a new trial "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'").[15]

As for my evidentiary rulings, Young takes particular issue with exhibit 779, the six-pack photo lineup in which Ms. Lewis circled Ferdinand's photo and identified him as the person who

---

[15] Ferdinand's claim that he was prejudiced by Young's defense also lacks merit. I previously held that "the defenses of Young and Ferdinand to the Jelvon Helton murder are antagonistic but not mutually exclusive because of the number of people at the bar and the fact that Ferdinand is not charged with the murder … and the murder is only part, albeit an important part, of the evidence of RICO conspiracy put on by the government." Dkt. No. 1409. In short, the situation "d[id] not amount to the type of manifest prejudice that requires severance." *Id*. As with Young, nothing that occurred at trial alters my analysis or conclusion.

shot "Poo bear," the nickname of Jelvon Helton.[16]  Young insists that the out of court

identification was not hearsay and should have been admitted for its truth.  Under Federal Rule of

Evidence 801(d)(1)(C), a declarant-witness's prior statement identifying a person as someone the

declarant perceived earlier is not hearsay.  But Ms. Lewis repeatedly testified that she was not

telling the truth in this written statement and her statements to the inspectors during the interview

and that she had falsely accused Ferdinand of committing murder.  RT at 9075, 9103–04.  I

admitted exhibit 779 into evidence unredacted and allowed Young to publish it to the jury.  RT at

9087.  But given Ms. Lewis's unequivocal testimony that she had been lying, I did not permit

Young to argue the truth of the matter asserted in that prior identification.  This ruling reflected an

attempt to draw a difficult line between the convergence of two rules of evidence—on one hand,

the prior identification was admissible as non-hearsay; on the other, the prior inconsistent

statement was hearsay because it did not meet the prerequisites of Rule 801(d)(1)(A).  I therefore

admitted the exhibit into evidence, allowed it to be published to the jury, but limited Young's

ability to argue the truth of the prior inconsistent statements contained in the exhibit.  To the

extent that this delicate balance reflected any error, it did not rise to the level in which the interest

of justice requires a new trial.[17]

### B.    Counts 21 and 22 and Evidence Related to Prior Acts of Pimping

Young argues that the denial of his motions to exclude the testimony of three women he

allegedly prostituted more than 15 years ago unfairly prejudiced him.  Mot. at 13.  In the SSI, the

government alleged that Young and other members of CDP "agreed … to engage in pimping,

including the pimping of minors… ."  SSI ¶ 14.  When I denied Young's motions to exclude the

testimony of these three witnesses (Omnibus Order on Mots. in Limine at 17), I hinged those

---

[16] In the recorded police interview, Ms. Lewis indicates that she saw Esau "pull out his gun" and
"kill Pooh bear."  The officer asked her to circle his picture and write out what she saw this person
do and who it is.  She then wrote, "Number 3 pull out hes [sic] gun & killed Poo Bear Nov 2, 2010
= Esauce – kid."  She circled Ferdinand's photograph.

[17] If this ruling was in error, I still would have excluded it under a Federal Rule of Evidence 403
analysis.  Young disparages this as a "post hoc rationalization."  While I may not have articulated
this at the time, I was concerned about the threat of misleading and confusing the jury with this
evidence.

rulings on the government's assertion that the "challenged evidence [was] essential to prove core activities of the charged CDP enterprise." U.S. Opp. to Young Mot. in Limine # 10 at 1 (Dkt. No. 1442); *see also id.* ("The challenged evidence is also necessary to prove the continuity and pattern elements of the racketeering enterprise over an extended period."). And the government insisted that "[t]he CDP enterprise can be defined by its use of pimping to generate money for its members and to fund additional criminal activities." *Id.* Based on the government's representations, I concluded that the evidence related to prior acts of pimping was not subject to the limitations of Rule 404(b).

The government's allegations were not completely borne out at trial. It offered no evidence that Young shared any proceeds from any pimping activity with any alleged member of CDP or that he pimped to increase or maintain his position in CDP. In opposition to Young's motion, the government argues that the uncharged conduct introduced through the testimony of AW, CW, and TW constitutes "racketeering activity" under 18 U.S.C. § 1961, specifically, violations of 18 U.S.C. § 2422(a) and (b), which "Young should be familiar with … as the jury convicted him under [these sections]." U.S. Response at 18–19. This stance suggests that the evidence should have been evaluated under Rule 404.

The government also insists that the conduct was tied to the CDP enterprise through the testimony of jailhouse informant Bruce Lee Marshall—the general assertion that "different parts of [Young's] gang did different things … . So for [Young] it was pimping, for others they were doing drug deals, for others they were doing robberies, and for others they were doing murder-for-hires." RT at 3550. This general assertion was corroborated by cooperating witness JB. RT at 4479. JB also testified that some CDP members made money by pimping. RT at 4479. As Young points out, "the fact that the alleged members of the enterprise 'did different things' cannot possibly constitute evidence that an individual's prior bad acts are inextricably intertwined with the charged enterprise." Young's Reply at 7. As I noted in the Omnibus Order on Mots. in Limine,

> The Ninth Circuit "recognize[s] two categories of evidence that may be considered 'inextricably intertwined' with a charged offense … . First, evidence of prior acts may be admitted if the evidence 'constitutes a part of the transaction that serves as the basis for the

33

criminal charge.' Second, prior act evidence may be admitted 'when it [is] necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). But "[c]oincidence in time is insufficient." *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1013 (9th Cir. 1995). "There must be a sufficient contextual or substantive connection between the proffered evidence and the alleged crime to justify exempting the evidence from the strictures of Rule 404(b)." *Id.*

Omnibus Order at 6–7. And I emphasized that I had to "evaluate each act individually." *Id.* at 7. The general assertion offered by Marshall and JB is not enough to render specific acts from as many as sixteen years ago "inextricably intertwined" with the charged conspiracy.[18]

The government urges that the testimony from CW and TW relaying prior bad acts provided evidence of Young's knowledge and intent to prostitute underage women. *See* U.S. Response at 19. This bolsters Young's argument that the evidence should have been evaluated under Rule 404(b). But the government also highlights the testimony from AW that Young took her to Las Vegas in 2012 with CDP member Tyrice Ivy and expected her to go make money by prostituting herself. RT at 1974–77. The acts related to AW were more recent and tied to another alleged CDP member. In the government's view, this "provided direct evidence of Young working in concert with another CDP member who was also acting as a pimp." U.S. Response at 20.

That evidence should have been evaluated—but not necessarily excluded—under a different rule of evidence does not justify granting a new trial. The jury heard extensive testimony from the undercover officer related to counts 21 and 22. RT at 2222–2529. It also had the opportunity to evaluate the testimony from competing experts. Young fails to explain how the evidence related to count 22 "preponderates heavily against the verdict." *Pimentel*, 654 F.2d at 545. His motion is denied.

## CONCLUSION

In accordance with the foregoing, none of the defendants have established that the evidence was insufficient to sustain his conviction, or that the interest of justice require a new trial.

---

[18] This is especially true for JB's testimony. During one of his first meetings with the government in May 2010, the FBI agent asked him if Young was a pimp and he responded that he didn't know and no one from CDP was dealing with him anymore. Trial Exs. 8010, 8061; RT at 5429–5432.

Their motions are DENIED.

**IT IS SO ORDERED.**

Dated: June 6, 2018

William H. Orrick
United States District Judge